Good afternoon, Your Honors. May it please the Court, Earl Silverstein for the Appellant, Committee on Grill Holdings, Incorporated. I think it's important to start with what happened last time we were before this Court. At that time, the panel awarded the trademarks within or upon 626 South Carrollton Avenue to Uptown Grill, L.L.C. The Court then reversed and remanded the matter to the District Court with very specific instructions by Judge Jones at the end of the opinion. She specifically directed the trial court to consider whether Uptown Grill should be bound by its pleadings, representations in court with respect to a license agreement for which its affiliate, Grill Holdings, paid a million dollars. She further directed the trial court to, at a minimum, review all facts and circumstances of the parties' contractual relationships and applicable trademark law before reinstating relief plainly beyond what was pled. The trial court simply did not follow those instructions on the remand. That is why this case is distinctive. It is not a case of an interloper coming in and using trademark trade dress. It's a case of a former licensee whose license was terminated at their fault by continuing to use trademark trade dress. That's why this is different. It's a combination of contract and trademark law. The Court, the Fifth Circuit, found the license to be binding upon Uptown Grill as a sub-licensee and also upon Charter's Grill as a sub-licensee of Grill Holdings. The panel's comments regarding the award with respect was strictly trademarks within or upon 626 South Carrollton Avenue. The panel did not award trade dress. Trade dress only appears one place in all these documents in this case. It appears in the license agreement. It does not appear in the bill of sale, which was a document used to transfer the trademarks. However, throughout the appellee's brief, he refers to the term marks in an attempt to gather and cultivate those trade dress. The license under Exhibit 1.1 has five items explicitly listed, including the trade dress associated with the Camellia Grill restaurant. I'll talk more about that when I get into the trade dress issue. The remand had the effect of reinstating the other claims that were pled initially in the trial court, which includes trade dress infringement, trademark infringement, infringement of the Louisiana service mark. Undisputed is the fact that two weeks after the bill of sale was executed, Grill Holdings paid a million dollars to license the five items listed on Exhibit 1.1 of the license agreement. If, in fact, they obtained the trade dress in the license agreement and, in fact, they obtained the trademarks everywhere, not just confined to Carrollton Avenue, why did they pay a million dollars? It's also undisputed, as the court found, that the licensee, Grill Holdings, appointed two sub-licensees, actually three sub-licensees, Destin, Charters, and Uptown Grill. Now, I don't really understand why we're talking about the determination of the ownership anymore. I really don't. Because they never prayed for ownership outside of the rights at Carrollton Avenue. Not in their original complaint, nor in any amendment. They never filed an amendment asking for that. So why did the court below not just dismiss it on that alone, on the response to a motion of summary judgment filed by Committee Grill Holdings, Inc., stated, Uptown Grill will not dispute the Schwarz Party's ownership of the registered trademarks as to all other locations. That should have ended it right there. It was a stipulation, an admission in pleadings. But instead, at oral argument, Judge Malazzo refused to accept that stipulation. She voiced concerns about geographic zones. There was no geographic zone because it was an agreement which does not come out of Lanham. It was an agreement which came out of the bill of sale. The bill of sale transferred to them the trademarks on or with upon 626 South Carrollton Avenue. That specific location. Not a block before, not a block after. What it conveyed was the trademarks located within or upon the property. That's correct, Judge O. It also conveyed a lot of other stuff. Personal items. Various items. FF&E. I assume you would agree that, let's just take cooking equipment as one example. It conveyed the cooking equipment that you could find on the property. Yes. I assume you would agree that there's no problem with Coder taking that cooking equipment at Carrollton and moving it to Charters. Moving it to Charters? Right. Well, he could do that, but that wasn't what happened. I understand that. But the point is, why couldn't we construe this bill of sale to provide rights that you find on the property, but to allow Coder to then move these rights elsewhere? Simply because that's not what the court awarded. The court awarded the use of those trademarks on or within 626 South Carrollton Avenue. It didn't say you could start using them anywhere else. I'm just trying to construe the bill of sale. Right. In the bill of sale, one of the problems, one of the issues with the bill of sale that we had, obviously, was the question of trademarks being included under the term tangible personal property. We took the position that trademarks were intangible property. We're living with that. We're bound by that. We're not disputing now that the bill of sale transferred trademarks within or upon 626 South Carrollton Avenue. And the reason that the court found that it was applying the legal term of the specific controls, the general. The specific term trademarks overlooks the general term personal property, tangible personal property. And we're saying that same has to be applied to this case relative to trade dress. The term trademarks was in that list of items that you just referred to in the bill of sale. Trade dress is not in that list. So again, if we're going to say the specific controls to general, that same legal theory must be applied in this case as well as to trade dress. So what's the trade dress? What is the trade dress? The trade dress is defined in the license agreement as all the trade dress associated with the Camellia Grill restaurant. Yeah, but that's using the word in the definition. Well, what it does, when that was executed in 2006, there was only one Camellia Grill restaurant. So all you had to go see what's in there. And everybody knows what's in there. It's the horseshoe shaped counters. It's the stools. It's the open pie cases. It's the seating arrangements. It's the columns out front. I get it. It's the building and everything in it. But why wouldn't it include trade dress? Because trade dress was not included within those items that were transferred. Again, Why did it have to be excluded? Why wasn't it included in the ... It doesn't have to be specifically identified. The bill of sale, you sold the whole kit and caboodle. The bill of sale was found to say that the specific controls of general. That's why the word trademarks can override the general which said personal property. Trademark is not personal property. It's an intangible property. I think we all should agree upon that. So if the specific controls of general, you can't then say, well, we're going to shoehorn it. We're going to say, since they gave you, it includes the FF&E, we're going to allow you to use that trade dress because that FF&E makes up the trade dress. You can't go that far if you're saying specific controls of general. That's the issue with that. Were you the lawyer that drafted the bill of sale? Pardon? Did you draft the bill of sale? No, ma'am, I did not. I didn't draft the bill of sale, nor did I draft the license agreement. The bill of sale was drafted by an attorney that was in the process of drafting documents for Mr. Coder's lender. The bill of sale came about gratuitously when the license was still being drafted. After negotiations were completed, the license was being drafted. The bill of sale then came about because Mr. Coder wanted to obtain the real estate prior to executing the license agreement, I think for the purpose of starting to renovate, rehabilitate the license agreement. I'm sorry, the building. And as such, the bill of sale was drafted with the intent of providing the use of those items there pending the execution of the license agreement, which took place two weeks later. So again, it begs the question, if you got trade dress, if you got the trademarks outside of Carrollton Avenue, why did you pay a million dollars two weeks later for it to enter into a license? So what do you make of the fact that the bill of sale says trademarks, names, logos, likenesses, et cetera, and all other personal and or movable property? Just what it is. It's movable property. As this court said in the Trademarks are movable? Pardon? So the trademarks are movable property? The items that the trademarks were on were movable property. There's menus that had the trademarks on them. There were glasses that may have had the trademarks on them. There may have been napkins. Okay, but just to be clear, it's not conveying items that happen to have marks on them. The bill of sale specifically identifies trademarks. Trademarks, correct. Themselves. That's correct. As, as, I guess, movable property. Correct. Why does that not just reinforce the general presumption that you don't segment marks, you have one mark and it could be owned by one person or sold to somebody else and used elsewhere? The, again, that's where it came down to the, the legal idiom being applied of the specific controls in general. Because it said trademarks, which is a conundrum to movable property, how do you then get it in? You have to get it in the way the court, the Fifth Circuit got it in and the district court got it in and we can't argue that, is that the, the specific controls in general. That's a Louisiana rule of law which was relied upon both, in and out. So again, there's nothing in the bill of sale that says trade dress. It does give them furniture, fixtures and equipment, but as this court said in two pesos, it's not that you're getting items, but it's rather the arbitrary fashion in which you combine those items that makes it distinctive, inherently distinctive. But what do you consider trade dress? What do I consider trade dress? The trade dress is the way that that restaurant is set up. Well, that's, that's the building. That's, that's the restaurant. It's not, I'm not talking about the building, Your Honor. I'm not talking about the physical building itself. I'm talking about the interior, how the interior design of the restaurant is set up with the horseshoe counters, with the open... They bought that. They bought that. They bought the whole restaurant. They bought it. They bought the trade dress, whatever you're thinking trade dress is. They bought, no, no, Your Honor, with all due respect, they did not... Well, what do you think it is? This is the third time I've asked you. What is an example of trade dress? Trade dress is the arbitrary combination that was designed and in use for over 60 years by the Chameleon Grill Restaurant of those functional items that you just referred to. That plus the other items are listed as the wait staff, the attire for the wait staff, the ordering, the way they call out the orders, the way they provide the checks, the way they straw, provide the straws to the customers, the straw popping it's called. Those are all part of the unique routine developed over 60 years, just like in 2 Pesos. What Your Honor is suggesting is what was specifically rejected by this court in 2 Pesos where the court said, you can't say we're going to use these functional items and then turn around and say they're not part of the trade dress because it's the combination, arbitrary combination of those functional items which makes them unique and inherently distinctive. So, therein lies the issue with that. But if you go and you say, all right, well you have two tracts here. You've got the license and then you could have lanum. Under license there's no law that says we have to, nothing in Louisiana says we have to define the trade dress. The license says I'm licensing you these items, included in which is the trade dress associated with a commercial restaurant. If Mr. Coder didn't know what it was, then why did he duplicate it at the other restaurants he opened up, Destin and Charters? There's no other reason, but he knew exactly what it was. He said, I want to retain the feel, the look, exactly the way it is. I don't want to change anything. So that is the reason. So under lanum, even if you go to lanum and say, okay, we throw away your license for a minute, under lanum we can show that because of the arbitrary combination of these elements, it has, it is inherently distinctive. We don't have to get into secondary meaning at all. Everybody knows that it is associated with the community grill restaurant. Likewise, the district court judge didn't want to follow the provisions of the license. She eviscerated it where the license says licensee, licensor owns all the intellectual property. Licensee acknowledges that ownership. Licensee will do nothing to attack that ownership of the intellectual property on Exhibit 1.1, which includes specifically trade dress. The other issues that come up is when we're talking about the license, the license had a specific prohibition that when it's terminated, the licensee can do nothing, take no action whatsoever, which would even suggest an affiliation. So therein lies the question that Judge Malauulu said, well, I'm not going to give you trade dress because there's no possibility of consumer confusion. And I'm not giving that because there is no existing and operating community grill restaurant other than the one on Carrollton Avenue. That's not required under the Fifth Circuit's decisions. In the Presley case, in Maltina, competition is not required. It's the affiliation that is the indication of consumer confusion. The entire public of the City of New Orleans assumed that the restaurant on Charters was part of the uptown grill, uptown location on the riverbed. There's no question about that. So it's the affiliation which causes the consumer confusion. I'm out of time, but I'll save my time for five minutes. Why don't you start with the problem of confusion? I'm sorry? Why don't you start with the allegation of confusion? Confusion. Yes, ma'am. May it please the Court? Scott Henskins for the appellees. I have with me Danny Burrell from my office and Kathy Torrigano from our co-counsel, the Berrigan Litchfield firm. I will, at your request, Judge, I'll start with the confusion angle because that's really where Judge Malazzo came down on this case. But I really would like the opportunity to address some of the things that Mr. Silverstein just discussed. At any point when a plaintiff seeks to enforce an unregistered trade dress, there are several factors that it has to prove in order to be successful. The last of those factors, and I will hopefully have time to go back to the first ones, is whether there is a likelihood of confusion. I want to start by saying that I think there's been some confusion about what the standard is in the appellant's brief at least once. They talk about the possibility of confusion. That is not a standard of trademark law. I'm not sure it's ever been a standard of trademark law. It is the likelihood of confusion that is the standard, and the likelihood is much more akin to a probability of confusion. It was incumbent upon the plaintiff, in this case the appellant, to prove a likelihood of confusion. And how do you do that? You do that with actual evidence. The last thing he said before he left the podium was that the entire town of New Orleans knew what this meant. Maybe, but we don't know that. There wasn't any kind of survey done or anything? No, ma'am. There is no evidence, admissible evidence, that was ever introduced on any of these things, much less that one thing. The closest they came were screenshots from Yelp or whatever with people whose names were the Sazeracker and Iowa Amy, people that we can't identify, we can't cross-examine, we don't know if it's their cousins or somebody else. There is no admissible evidence. By the way, Judge Malazzo specifically addressed those screenshots, cited a Walmart case which says that is classic hearsay and inadmissible. But they were required to come forth with evidence of this. I think I know why they didn't, because there can be no evidence of this. There is no Camellia Grill in operation other than the one my client owns. They bought, Judge Ho, you were here seven months ago, we were talking about this case on trip number two, we're now here on trip number three, and I believe Judge Malazzo feels this should be our last, and we agree. But we bought everything. We bought the stools, it's specifically listed in the bill of sale. We bought the counters. We bought the kitchen equipment. Everything they identify as their trade dress, we bought. We bought it all. If a customer would be confused with anything, the only thing it could be confused with is something that we own. All of. They have not, since 2005, they have not operated a single restaurant under any of these trademarks, trade dresses, service marks or any other term you want to put on it. Their only business plan for the last 15 years has been suing us for money. That's it. They've done nothing else. So if there was going to be confusion, I would ask them, to whom would they be confused with? The only answer is that they're confused with my client's business. That's not confusion. That's normal business. You want to have your brand be consistent. And Judge Ho, you mentioned at the very beginning, we bought it all. I mean, if we wanted to pick it up, if we wanted to take the pie case, if we wanted to take the stools, if we wanted to take the counter, the Mickey Mouse clock of all things, if we wanted to take that and move it to Charter Street or Metairie Road or anywhere else, we have the right to do that. Did you install any of the, what opposing counsel refers to as trade dress, in the Charter Street restaurant? Well. If you walk in, does it look like the old community grill? I think there are two questions here. Your Honor, I've never been in the Charter Street location, but I think one of the problems here is a basic failure of proof. This case, in my opinion, transferred after this last round of summary judgments from a trademark trade dress case to just a basic issue of evidentiary proof. It is their responsibility under the law. Amazing Spaces is one of the leading cases, Pebble Beach, and many other ones. They have to identify the individual elements of their trade dress. What they've done in this case, and this is it, they have issued a list of discovery responses, or a discovery response that has a list of eight things in it. The stool, the Mickey Mouse clock, the counter, things of that sort. This is what Judge Malazzo said about this. The Schwartz parties have defined some elements of an alleged trade dress in their discovery responses, attached an exhibit to a different motion. The court notes, however, that no admissible evidence has been offered to verify the existence of these alleged elements. There are no photographs. She specifically, with respect to this motion on the trade dress, they offered nothing. Judge Ho, it's like you claiming that your necktie or that mine infringes the trade dress of yours. We can't see yours. Yours is covered by a black robe. The court couldn't see theirs because there's no evidence in the record. If there's no evidence, how could she base a ruling in their favor? They made it easy for her, and frankly, I think they made it easy for all of us because there's no evidence in the record. It is a basic failure of evidentiary proof. And that goes down the line. They have to go back to the bill of sale for a second. I'm sorry, Judge? Let's go back to the bill of sale for a second that you just had. If we take your view that the bill of sale is as broad as you say, sort of along the theory that I was using during my questioning earlier, what's the licensing agreement for? Why did you pay? How much did you all pay for the licensing agreement? It was a million dollars, I believe. So what did you get for that? In our view, we got the right to open other restaurants in other areas. We did it in Destin. There your theory of the bill of sale, you already bought all that. We didn't. So you're paying a million for nothing? I'm sorry? Go ahead, please. I'm going to make sure I'm answering your question. If I understood your theory that the bill of sale was buying everything, then why pay a lot of money for licensing agreement? What's left? That's a great question. In our opinion, Judge, the bill of sale is all-encompassing. I think that's what this is a question of ambiguous contracts versus unambiguous contracts. To me, the bill of sale is perfectly clear on what we bought. So your theory is the licensing agreement wasn't necessary. You would have been just as fine just under the bill of sale with no license agreement whatsoever. That's a great question. I'm struggling to remember the actual facts as they were presented in the depositions to be perfectly candid with you. I think our client was trying to buy the restaurant. What Judge Malazzo said is we bought it lock, stock and barrel. That's her quote. I think that's what happened. Under the bill of sale? Correct. Under the bill of sale. What's troubling to me though is if I understand the chronology, you all did the bill of sale on August 11th. Correct. And you did the license agreement 16 days later. About two weeks. That is correct. Why would you pay a lot of money for the second if there wasn't anything left over to get? I think when we filed our original summary judgment, we pled very specifically. We obtained through the bill of sale the trademarks within and upon Carrollton. I think the evidence showed that the license agreement was to open other restaurants. I don't believe that that is necessarily a precursor to them having additional rights in terms of a trade dress, for instance, somewhere else. Does that make sense? I'm not sure it makes sense. You're saying the license agreement was to open up other restaurants, but isn't your theory that the bill of sale gave you the right to open up other restaurants? Yes. So is your idea then that the license agreement was sort of belt and suspenders? You think you have everything under the bill of sale, but you know, law is ambiguous. You never know what a court will do. So the license agreement sort of is like a quick claim deed, is that? Judge Clement, you asked Mr. Silverstein a bout the documents. He did not. Did you draft the license agreement? No, I did not. None of us were involved in what was going on, to be perfectly frank with you. I didn't know my client at that time. I think what we are left with is the paper. We're left with it written on paper. What difference does it make if it goes under one or the other, if it goes under one or the other? In other words? And I think that's the basic claim here. I mean, it's in the documents. We bought this stuff. It would seem to me if it's not in the bill of sale, then it's in the licensing agreement, isn't it? One or the other. One or the other. What difference does it make? I think that's fair. I'm not sure it does make a difference, Your Honor. Well, except it was terminated. The license agreement was terminated, but if it's in... And under the provisions, as I understand them, all those rights, whatever the license agreement is about, upon termination, all those rights go back naturally to CAMILIA. Correct. I mean, just in a regular, I would say in a regular scenario, that would be true. They cite the Elvis case. They cite the Frisch case in particular and the Burger King case. Those are what I would call true franchise cases, right? The difference in this case from all those other cases, and what makes this case really unique, I think, is that there was a purchase here. You know, the CAMILIA Grill, Carrollton location, we bought. This Court has said so. That is no longer in dispute. We bought it. And no other franchise case that I'm aware of, including the ones cited in all these briefs, did anybody ever own anything, including trademarks? You've been a little ambiguous, but is it fair for me to think that your argument is the license agreement didn't really do anything. It was belt and suspenders, just to kind of make sure you have all your rights. But in your theory, you didn't actually need it. I think that is a fair interpretation. Okay. How do you square that with the recitals? I mean, the license agreement, which you all obviously agreed to, specifically says that they own the intellectual property. I'm looking at 1.1 of the recitals. I don't have the license agreement in front of me, Judge. I'll take your word for that. Licensor owns the intellectual property, trademarks and service marks described on Exhibit 1.1 and X there, too. Judge, I would say that's exactly where Judge Malazzo ended up on this thing. You know, the trademark infringement issues she ruled in our favor on, this became a breach of contract case to her. And whether or not our continued use of the marks breached the license agreement, which she found that they did, there was a trial, an actual trial, not just a summary judgment proceeding, but an actual trial in that matter. She allowed them to put on evidence of whatever their contract damages were, which they were unable to do. But her interpretation of this is that they still had rights in the marks by virtue of the contract. The way I square this in my mind, Your Honor, and I think we all have to recognize, this is a very unique situation because of the bill of sale. It is. But I don't find them necessarily inconsistent because at the time of the license agreement, particularly when the bill of sale was signed, there's no question that CGH owned the trademarks, names, logos, and all of those types of things. Okay? I still dispute that there was an actual trade dress and we can talk about that, but there's no doubt. And from a contract basis at that time, there were rights that they owned. Fast forward, I mean, that was 2007, fast forward a dozen years, the issue in trademark law is not, do I have a registration and that gives me ownership? It's use that gives you rights. Use. And I think that's what troubled Judge Malazzo's trademark issues because they haven't done anything to actually use the marks since they sold the marks. So those two things are not inconsistent to me. So your theory is under 1.1 back in August of 2006, they have rights, but those rights essentially evaporated by the time of termination? I would agree with Judge Malazzo's approach that from a contractual perspective, they had rights at the time, but from a trademark perspective, not a contract perspective, but from a trademark perspective, she was concerned, and I agree with her on this, she was concerned with the lack of use of the marks. You might have the biggest, prettiest marks. If McDonald's shuts down tomorrow, they will lose the rights in those trademarks. They can abandon them. You can lose rights for non-use. In fact, at the United States Patent and Trademark Office, you are required to periodically issue affidavits to them, proving to them that you are still using the marks. Otherwise, they will abandon your mark for you, whether you like it or not. Even if you are using it and don't file the affidavits of continued use under Section 8 and 9, they will abandon your mark for you. You are required to use these things and prove use in order to get there. So to me, this comes down, this case is interesting. I will give you that. But I don't think it's complicated at this point. I think it's very simple, and it's a question of proof in the record. What have they done to prove that they have an actual trade dress? There's nothing in the record. Judge Malazzo said that in Footnote 26 on Record on Appeal, Site 3225. After that, they've got to prove that their mark, the trade dress, is distinctive. There's nothing here that's distinctive. They can do that by showing it's inherently distinctive, which means by its intrinsic character that people would automatically assume that it's part of the community rural restaurant, or that it acquired secondary meaning, which is in the customer's minds, they are entitled to that. These are both issues of fact. And the Pebble Beach case, the Amazing Spaces case, these are issues that are ripe for summary judgment if the record compels that way. And what we have to look at is what evidence was put in the record to prove that their trade dress, if one exists, and there's no evidence in the record to prove that, but to prove that it was inherently distinctive. They've done nothing. The only thing they have in the record are inadmissible screenshots from Yelp or Google or whatever it is, and a deposition excerpt from my client which says that, yeah, I bought this thing. Why would I change what I bought? That's it. That's not evidence that's going to get them past the summary judgment. Same thing for secondary meaning. Secondary meaning is something that they are going to have to, let me step back. What have other cases done with respect to restaurants and inherently distinctive trade dresses? Miller's Ale House, 702 Fed 3rd, 1312, it's 11th Circuit case. The plaintiff in that case claimed a trade dress in the name of the red letters on the building, a name on the menu, dressing staff in khakis and polo shirts, a center bar with a soffit, high top tables, and wood bar, inherently distinctive. That looks like every other sports bar in the world. A lot of those elements are something they're claiming here. The Fuddruckers case, the 9th Circuit case from 1987, it's cited in our brief. Food prep areas are visible to the customers. Bulk food items are kept in a restaurant. Iced tea was served in a garbage can. Condiments served at a large black Crocs. Condiment bar with uncut items on display. Industrial size salt and pepper. Two by four tiles on walls, bar, and counter, what they call ubiquitous in the case. Neon signs, mirrors, brown and white checker floors, tablecloths, naming a baker, the bakery area, Mother Fuddruckers, and newspapers on the table. The court said that that is not inherently distinctive. What is inherently distinctive about stools or counters or Mickey Mouse clock? If we follow along with what these cases say, and it seems logical to do so, there's nothing in there to show that they're inherently distinctive, but more importantly, where's the proof? Where's the evidence of that case? If they can't show that, then they have to show secondary meaning, which means that a substantial number of the relevant buyer group considers or associates the trade dress with the commuter grill brand. There's no evidence. How do you do that? Amount of sales, no evidence of that. Advertising, no evidence of that. Consumer survey evidence, no evidence of that. Direct consumer testimony, not even any evidence of that. There's nothing. All they have is my client saying, yeah, I bought it, why would I change it? That's it, and some inadmissible screenshots. They fail across the board. They also have to show that the elements aren't functional. What do we have here? Straw popping. We take the paper off the straw for the client so that they can drink their drinks. Seems functional. Shape of the counter seems very eerily similar to the Miller's Alehouse case, the center bar and the soffit. The uniforms, Miller's Bar, Miller's Alehouse, same thing. Order calling routine. Ever been to a Waffle House? I'm embarrassed to admit that I have. You've got to call them out in these diners. It is a diner. This place is no different than the sports bar concept for Miller's Alehouse. This is a diner. It looks like a diner. It acts like a diner. They sell stuff just like a diner does. That's not inherently distinctive. That's very descriptive at best. And Judge says these pieces, parts, are functional aspects of a diner. We talked about the likelihood of confusion. We talked about the license agreement. To some respect, they use the trade dress issue. They make a Lanham Act argument and they make a contract argument under the license agreement. The license agreement, as he willingly admits, just says trade dress. It doesn't define a single thing. Under basic contract law, there's not enough there to prove their case. I want to talk about damages real quick because damages are important here. Judge Miller, the question in my mind is, let's assume things go south for me here. What does that accomplish? This is not a jury trial. The jury's never going to see this case. No jury was ever pled. This trial judge is the trier of fact. She has already looked at all of these issues, including damages. She has looked at the Pebble Beach factors, all six of them, and she addressed all six of them in her brief, not just two. She addressed all six of them and found that there is, considering those six Pebble Beach factors, there's nothing in this record, there is no evidence in this record to show that they are entitled to damages. Again, damages in a trademark case, even if infringement is proven, even if infringement is proven, which was not in this case, they are not a right. You are not automatically entitled to damages. You are entitled to damage if you can show to the court with evidence that you meet the Pebble Beach factors and that that is, you meet your burden. There was no such effort in this case, frankly. They never put forth the evidence to show evidence to show that we would somehow be required to disgorge profits or anything of that sort. Your Honor, I want to finish very briefly. There was a case, the Maltina case, which he cited, and it struck me in this case. It was Judge Johnson. In the ten years since this plaintiff filed the original petition, this case has been before us three times. But can you give us the citation? Yes, ma'am. That is 613 Fed Second 582, cited in both of our cases, I believe, both of our briefs. In the ten years since the plaintiff filed their original petition. Counsel, we've got your argument because your time is expired. Thank you, Your Honor. I appreciate it. What I'd like to do first is address the question that Judge Hogue raised about why the license afterwards. And what's really interesting is if they got everything out of the bill of sale, the bill of sale was $10,000. If it was boot and suspenders, as counsel suggests, why would you pay $10 million? That's an awful expensive boot and suspenders, I'm sorry, $1 million. Why would you pay $1 million for boot and suspenders? You got to go to a better store to buy it then. What about his other arguments that he addressed later, that there's no evidence of confusion? And what about damages? Very simply, Your Honor, what happened was, on the evidence of confusion, there was evidence that was admitted. Counsel says that the screenshots were inadmissible. The court never ruled on screenshots. They filed a motion to eliminate it. That was never ruled on because we never went to trial on those issues. So the screenshots were proffered, were attached as exhibits to the motion for summary judgment. Also attached as an exhibit to the motion for summary judgment was an affidavit of a private investigator who visited the Charter's location, visited the Uptown location on numerous occasions, and documented the use of these items at all times. But doesn't that have to be confusion and an element? I'm sorry? Is confusion an element or not? Confusion is an element in a normal Lanham case. However, as this Court said in Presley, confusion is satisfied whether it's in a non-competition case. Confusion is satisfied by affiliation. And that's exactly what happened. Judge Malazzo herself said, and this is on page 3824 in the record, she's talking about the Charter Street location. But when one walks in, and I haven't been in there, I don't know, but I've got photographs here, it looks like Camellia Grill, it smells like Camellia Grill. And interestingly, Judge Malazzo also found, regarding the question of did we describe our trade dress, our trade dress was set forth in the license agreement, it said all trade dress associated with Camellia Grill. It was amplified in our second amending of supplemental petition, which is a complete paragraph describing the elements of the trade dress. Judge Malazzo found that based upon that, she stated that the discovery responses were sufficient to put the coder parties on notice of the elements of the putative trade dress. That's in the record at 3222. That alone should have stopped the motion for summary judgment, should have denied their motion for summary judgment. They were put on notice of the elements of the trade dress. So how can they say they don't know what it is if they're put on notice of it? The court found that, yet she granted their summary judgment. It's totally inconsistent. Totally inconsistent. As far as going back to the license question that I originally started with, so you have the license, two weeks later they pay $10 million, and then after that, they sub-license Destin, Charters, and Uptown. Uptown, the entity that owns the trademarks. Why would they do that? Why would they do that if Uptown had the right to use those anywhere else? Again, in their pleadings, they've never asked to be able to use these trademarks that they bought by the bill of sale anywhere else other than at 626 South Carrollton Avenue. You can't go beyond their pleadings and what they, relief they've asked for. It's not logical to say, okay, for $10,000, I bought these trademarks, I'm going to use them throughout the entire United States. Lose it or use it theory, that doesn't fly either, because very simply, after the bill of sale, what did Community Grille Holdings, Inc., who's the owner, registered owner of the trademarks, do? It licensed them. That's a use. And then what did it do? There were sub-licenses. It approved sub-licenses, three sub-licenses. So it continued to do that. Community Grille Holdings, Inc., continued to receive income and policing the license. That's use of those trademarks that was registered. There was no loss. In order to prove abandonment, you must show a requisite intent to abandon. Clearly that's not the case here. So the use or lose it theory is out the window. That just doesn't make a bit of sense. Finally, I would just suggest to the court that as far as damages go, they had eight years since June 1, 2011. The license was terminated effective June 1, 2011. They continued to use these marks and the marks, including the trademarks and the trade address, for eight years. We did have evidence that we proffered, because the court wouldn't allow us, which was the financial records which we had issued and received under a request for production of documents, the ongoing records. They showed $8 million in gross profits. Is the injunction sufficient? I suggest that it's not, because as of this day, they're using these documents, these trademarks, at another location in Metairie. Thank you. Thank you. That will conclude the arguments for the day and for the week. Cases are under submission. Thank you.